## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| ICDS, INC. D/B/A AMADOR NETWORKS,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　　　- vs. -<br><br>RIZING GEOSPATIAL, LLC,<br>CYBER HUSKY, INC.,<br><br>　　　　　　　　　　Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>DECEMBER 18, 2025 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff ICDS, INC. d/b/a AMADOR NETWORKS ("Plaintiff" or "ICDS") hereby alleges as against Defendants RIZING GEOSPATIAL, LLC ("RIZING"), and CYBER HUSKY, INC. ("HUSKY") (collectively "DEFENDANTS") the following:

### PARTIES

1.      ICDS is a California Corporation with a principal place of business at 3155 Montrose Way, El Dorado Hills, CA 95762.

2.      RIZING is a Florida Limited Liability Company with a principal place of business in Connecticut. RIZING's business address is 300 First Stamford Place, Stamford, CT 06902.

3.      HUSKY is a South Carolina Corporation with a principal place of business at 4000 Faber Place Dr., Suite 300, North Charleston, South Carolina 29405.

### JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action under 28 U.S.C. §1332 as the amount in controversy, excluding interest, exceeds $75,000 and there is complete diversity among the parties.

5.      Venue is appropriate in this Court because the parties contractually agreed to "submit to the jurisdiction of the courts of Connecticut." Venue is also appropriate in this Court because RIZING maintains its principal place of business in this judicial district.

6.    Additionally, this Court has jurisdiction over HUSKY because HUSKY engaged in malfeasance in concert with RIZING and then subsequently entered a business relationship with RIZING, a Connecticut resident, including working on subsequent CALTRANS projects as alleged herein.

**FACTS COMMON TO ALL CAUSES OF ACTION**

7.    ICDS is an information technology company with years of experience providing services to government contractors and the municipalities themselves, specifically hosting programming environments for code development and testing related to government programs.

8.    ICDS is a California certified disabled veteran business enterprise and a federally certified service-disabled veteran-owned small business.

9.    ICDS obtains its contracts through public bidding processes. ICDS has always maintained the strictest confidentiality in its provision of services, as its reputation relied upon its ability to keep careful control over any confidential government data to which it was hired to host, develop, or otherwise maintain.

10.    ICDS hires qualified, competent and trustworthy subcontractors to work on its projects, evaluating subcontractor assets on their skills, while also binding them to nondisclosure agreements to safeguard the secrets it is regularly entrusted to maintain, as well as its own confidential programs and assets.

11.    RIZING is a consulting company which seeks to support its customers by improving their business processes and asset and human management with its deep technological expertise.

12.    In April 2022, Wipro Ltd., an Indian multinational IT, consulting and business process services company, acquired RIZING's parent company Rizing Intermediate Holdings, Inc.

for $540 million.[1]

## RIZING and ICDS Win A CALTRANS Contract

13.     ICDS became familiar with RIZING when they were both subcontractors on a CALTRANS project called Transportation Asset Management System ("TAMS1").

14.     On the TAMS1 project, Data Transfer Solutions, LLC was named the prime contractor responsible for overseeing ICDS and RIZING.

15.     ICDS sought assistance with certain technical aspects of their role in TAMS1 and ultimately hired Shea Erickson ("ERICKSON") and his company HUSKY as a subcontractor.

16.     CALTRANS terminated the TAMS1 project prematurely because of an issue with Data Transfer Solutions, LLC and requested bids for a new project lead.

17.     In September 2021, RIZING and ICDS agreed to work together on the Transportation Systems Network Replacement ("TSNR") project from CALTRANS.

18.     TSNR was a CALTRANS program meant to upgrade the California Transportation System Network to include temporal, geospatial capability and enhance safety analysis.[2]

19.     In 2023, CALTRANS selected RIZING to be the prime contractor on TAMS2, CALTRANS' new iteration of TAMS1.[3]

20.     Shortly thereafter, RIZING asked ICDS to join RIZING as a subcontractor on the TAMS2 project, and to provide cloud hosting services in addition to IT professional development

---

[1] Wipro Ltd. publicly announced the acquisition on its websites: https://www.wipro.com/newsroom/press-releases/2022/wipro-to-acquire-rizing-to-create-an-sap-consulting-powerhouse/. Independent news outlets confirmed other details of the acquisition: https://www.consulting.us/news/7533/wipro-acquires-sap-consultancy-rizing-for-540-million.

[2] CALTRANS' posted materials can be reviewed online: https://dot.ca.gov/-/media/dot-media/programs/local-assistance/documents/hsip/mire/tsnroverview.pdf

[3] RIZING proudly announced its selection on its website: https://rizing.com/news/rizing-awarded-tams-project-caltrans/.

services.

21.     ICDS agreed to act as a subcontractor on the TAMS2 Project.

22.     On August 9, 2023, RIZING and ICDS entered into a Master Consulting Services Subcontract Agreement and related Statements of Work (the "MCSSA"). Pursuant to the MCSSA, ICDS agreed to provide cloud hosting services and professional development services.

23.     To fully service the MCSSA, ICDS renewed its subcontractor agreement with HUSKY to work on administering the Microsoft Azure hosting environment for TAMS2 and lead development efforts.

24.     ICDS authorized only ERICKSON and Adrian Pascual (a former ICDS subcontractor who has since resigned) to perform services on TAMS2 CALTRANS projects.

25.     ICDS separately informed ERICKSON and HUSKY about ICDS' other, unrelated governmental contracts and projects to determine whether HUSKY would work with ICDS to support them, but ERICKSON and HUSKY elected to only work on TAMS2.

26.     These unrelated projects also involved digital environments hosted by ICDS in Azure subscriptions (the "Unrelated Environments"). As he did not agree to work on them ERICKSON was not authorized to access or alter them, though he had access through his ICDS login.

27.     Once brought on by ICDS, ERICKSON was re-introduced to staff members at RIZING with whom he would be collaborating on TAMS2, including at an in-person event in California in August 2023.

28.     After successfully winning the TAMS2 bid, RIZING bid for other projects with ICDS as a subcontractor, including an opportunity with the province of Ontario, Canada.

29.     RIZING planned to operationalize the TAMS2 project and develop and sell it as a

"custom off-the-shelf" or "COTS" solution for other transportation departments around the world.

30.     In March 2024, ICDS learned that RIZING was not awarded the project in Ontario, Canada.

**Defendants Conspire to Remove ICDS's Access**

31.     ICDS, RIZING and HUSKY worked collaboratively on TAMS2 until April of 2024.

32.     In that time, ICDS (and ERICKSON using access granted by ICDS) created accounts for performing different tasks on the digital environments hosted by ICDS. Each activity undertaken by each account was logged automatically by the Microsoft Azure system's monitoring tools, including information related to logins such as the IP address of the computer logging into that account at that time.

33.     The following individuals were provided with accounts and logins by ICDS and the activity that occurred through such accounts was logged[4]:

- ERICKSON: SErickson@icds.com

- Brian Marchionni (RIZING TAMS Technical): bmarchinno@rizing.com

- Anthony Hampton (RIZING): ahampton@rizing.com

- Clay Hunt (RIZING): chunt@icds.com/chud@tamsdev.com

- Tom Sebastian (RIZING): tsebastian@rizing.com

- Trish Fannin (RIZING): tfannin@icds.com

34.     In addition to the named accounts, ERICKSON set up generic accounts to use while operating in the hosted development environments. Those included the following:

- DeploymentAdmin@icds.com

---

[4] RIZING hired other subcontractors who also had access.

- DeploymentAdmin2@icds.com

- DeploymentAdminTest@icds.com

35.    Multiple users had access to, and used, the DeploymentAdmin@icds.com ("DeploymentAdmin") account, including but not limited to:

- ERICKSON, who lives in South Carolina, and used the same IP address to initially create his personal account and then later access DeploymentAdmin.

- Anthony Hampton, an employee of RIZING, was known to work out of Georgia and Alabama (confirmed by IP addresses associated with many of his logins to his ahampton@rizing.com account). Those IP addresses were also used to login to and access DeploymentAdmin throughout 2024.

- John Serrano, another HUSKY employee living in Beaverton, OR, logged on and used DeploymentAdmin (confirmed by access logs and IP addresses), though he was not authorized by ICDS to use this account or access CALTRANS hosted environments.

36.    ICDS did not, and would not, have authorized this account sharing because it represents a security risk to the hosted environment.

37.    On April 19, 2024, ERICKSON created a Microsoft Loop instance for RIZING employees and other TAMS2 subcontractors to use.

38.    ERICKSON used his ICDS email to invite team members but excluded ICDS from such invitation.

39.    The Loop instance is protected by two-factor authentication, preventing ICDS from

reviewing its contents, despite ICDS's ownership of the hosted environment.

40.     On information and belief, the Loop instance serves as a workspace where RIZING, HUSKY and ERICKSON coordinated and planned their removal of ICDS's access to its own hosted environments.

41.     Through May 2024, ICDS's hosted environment's activity logs showed only routine activity from all the users, comprising a low number of daily actions taken.

42.     On May 16, 2024, the Azure activity logs showed a significant increase in activity related to control and access permissions over the ICDS-hosted TAMS2 environments.

43.     Between May 16, 2024, and June 2024, those same logs showed hundreds of actions taken on the ICDS-hosted TAMS2 environments.

44.     The logged actions demonstrate that RIZING, HUSKY and ERICKSON were sharing the DeploymentAdmin and DeploymentAdmin2 accounts, and manipulating the users, groups and company information relevant to the hosted environments.

45.     Because the Microsoft Azure system logs the IP address of the user logging into the different accounts, ICDS has identified when ERICKSON logged in (typically from near his home in South Carolina) or when a RIZING employee was using the DeploymentAdmin and/or DeploymentAdmin2 accounts.

46.     IP address logs confirm that ERICKSON and RIZING employees controlled the hosted accounts, including the TAMS2 hosted environment.

47.     ERICKSON used his access to the ICDS-hosted environments (including TAMS2) to give global access to the DeploymentAdmin and DeploymentAdmin2 user accounts.

48.     Based on available logs, ERICKSON changed the address and contact information of the Microsoft Azure cloud subscriptions from ICDS control on or around May 28, 2024. While

ERICKSON was authorized to access the TAMS2 environment, he was not authorized to change or remove ICDS's access to it.

49.     Subsequent analysis of those access logs further revealed that DeploymentAdmin and potentially other non-ICDS users leveraged tools to perform unknown operations on the TAMS2 environments:

- First, an Azure Store[5] application called MyGalleryApp was downloaded and used by different users. MyGalleryApp is used to copy environments hosted on the Azure cloud.

- Microsoft Graph was also installed and used. Graph is a tool that lets users programmatically create and manage applications and can effectively perform a large number of IT services on Azure cloud instances.

- Software from WhiteDuck, a Dutch company that publishes Azure environment/application building tools for cloud users, was also found on the TAMS2 environment after it was recovered.

50.     Because of ERICKSON's access and familiarity with the system, none of these changes were immediately apparent to ICDS and instead were only gleaned through careful analysis of the Azure instance after the fact and through review of relevant access logs.

**RIZING Ends the Relationship with ICDS**

51.     On June 10, 2024, ICDS received a letter from RIZING terminating the MCSSA effective June 24, 2024.

52.     ICDS informed ERICKSON that the MSCSSA with RIZING was ending and asked

---

[5] The Azure Store is a Microsoft-hosted application store which allows companies to make their tools for working on Azure environments easily available to other users and companies with Azure subscriptions.

if ERICKSON wanted to continue working together in some fashion.

53.    On June 11, 2024, in a series of instant messages, ERICKSON agreed that he wanted to continue to work together.

54.    Later in that same chat, ERICKSON stated that RIZING had engaged with him directly, despite the contracts in place.

55.    ICDS then asked ERICKSON who at RIZING he had been in contact with, but ERICKSON did not respond.

56.    On June 13, 2024, ICDS sent ERICKSON a meeting invitation to discuss the termination and transition.

57.    On June 14, 2024, after not hearing from ERICKSON for several days, at around 10:00 a.m. PT, ERICKSON sent a short message terminating HUSKY's work on TAMS2. ICDS attempted to revoke ERICKSON's access to his ICDS-hosted email and remove his access to the Azure environment but discovered that the various subscriptions to TAMS2 Azure environments did not appear in ICDS's dashboard to enable such revocation/removal.

58.    Between 1:00 p.m. and 6:00 p.m. PT on June 14, 2024, ICDS tried to locate its hosted TAMS2 environments and identify how they had disappeared from their access point. However, ICDS's ability to inspect the TAMS2 environment had disappeared.

59.    ICDS then revoked all employee and contractor access to emails.

60.    On June 15, 2024, ICDS suspended all access to its password manager, cutting off access to its subscriptions to individuals and entities outside ICDS.

61.    ICDS contacted Microsoft and informed them of the theft of the TAMS2 hosted environments and several hosted environments supporting ICDS's other governmental clients.

62.    On June 15, 2024, with Microsoft's assistance, ICDS concluded that two hosted

TAMS2 environments ("TAMS2 Environments") and one of the Unrelated Environments were transferred away from ICDS's rightful control.

63.    On or about June 30, 2024, Microsoft was finally able to restore ICDS's access to the TAMS2 Environments and to the Unrelated Environment.

64.    In emails dated July 10 and 11, 2024, Microsoft confirmed that the CALTRANS TAMS2 environment and the Unrelated Environment transfers were unauthorized by ICDS.

65.    ICDS continued to pay Microsoft for Azure cloud services on the CALTRANS hosted environments for the period between when RIZING terminated the MCSSA and when ICDS finally recovered access to the hosted environments.

66.    During the period that ICDS did not have access to the TAMS2 Environments, no one from RIZING notified ICDS regarding any disruption or termination of their access to the TAMS2 Environments.

67.    Likewise, no one from CALTRANS reported any disruption or termination of access to the TAMS2 Environments.

68.    Further, RIZING did not demand access or turnover of any Azure cloud files, data, information, logs, logins, or any other related files or access during the period that ERICKSON and HUSKY had removed ICDS's access to the hosted environments.

69.    Interestingly, in a proposal dated June 7, 2024, and prepared by RIZING to be sent to CALTRANS, HUSKY's logo is displayed on the front page, and on page 28, the proposal reads (in pertinent part) "We have replaced ICDS with Cyber Husky. We may need to add a DVBE to this contract to meet the 3% requirement if we cannot add TAMS3 to our existing contract. We need to discuss with Caltrans."

70.    RIZING and ICDS had previously been discussing ICDS's involvement in

RIZING's planned bid on the TAMS3 project.

71.    Those discussions were terminated when RIZING terminated the MCSSA on June 10, 2024.

### The Incident's Effect on ICDS's Other Active Contracts

72.    Throughout the period relevant in this Complaint, ICDS also had other active contracts with other Federal and California-funded programs and agencies including a Federally funded contract developing educational materials for Mother Lode Job Training and four sheriff's departments in different counties in California.

73.    One project (the Correctional Education project) involved digital hosting of materials developed and owned by ICDS. These materials were confidential and valuable to the programs ICDS was contracted to develop and administer for. ICDS used its knowledge of information technology to provide its developed materials to numerous correctional facilities that were part of the program.

74.    However, when ICDS lost access to its digital environments because of Defendants' actions, ICDS could no longer digitally administer the correctional programs it was contracted by a multi-jurisdictional consortium to do.

75.    Instead, ICDS attempted to manually transfer the required files, often by driving USB drives between the relevant facilities. This Band-Aid solution was unsustainable, and without the ability to digitally administer the program, ICDS lost the ability to continue developing this solution to sell to other correctional facilities and governmental agencies.

### Conclusion

76.    On information and belief, neither RIZING nor CALTRANS lost access to the TAMS2 environments that were hosted by ICDS because, starting on or about June 3, 2024 (when

ICDS received the automated email from Microsoft that a subscription had been terminated), RIZING, ERICKSON, and HUSKY used their access to recreate the environments on their own systems such that they would not need ICDS's hosting capabilities for the remainder of TAMS2 and on future projects.

77.    Accordingly, ICDS is forced to conclude that RIZING's June 10, 2024 termination of the MCSSA was intended to cover up its part in ICDS's loss of the CALTRANS digital environments, interfaces, and hosting resources.

78.    ICDS also must conclude that DEFENDANTS' actions were undertaken to retain the revenue that was being paid to ICDS for themselves in TAMS2 and in future contracts.

79.    In short, RIZING and HUSKY removed ICDS's access to its hosted environments, rendered the services that ICDS had been hired to provide using ICDS's hosted environments, and then cut ICDS out of the job and away from the revenue ICDS was to earn. RIZING and HUSKY's actions also impacted ICDS's other contractual relationships and projects. Accordingly, ICDS seeks to recover monetary damages which resulted from DEFENDANTS' actions.

## FIRST CAUSE OF ACTION

### (Civil Conspiracy against DEFENDANTS)

80.    ICDS hereby realleges each allegation in paragraphs 1 through 79 as if fully set forth herein.

81.    Starting in early 2024, DEFENDANTS began working in concert to misappropriate ICDS's developed digital environments, its interfaces, and its hosting resources to provide services which ICDS was contractually responsible for to service RIZING's clients and keep the revenue that ICDS would otherwise have earned in the MCSSA and in subsequent agreements.

82.     In furtherance of that combination, DEFENDANTS shared amongst themselves the login credentials to, at least, the DeploymentAdmin and DeploymentAdmin2 user accounts to, on or about June 14, 2024, wrongfully transfer or remove ICDS's access to ICDS's developed digital environments, its interfaces, and its hosting resources away from ICDS's control.

83.     DEFENDANTS, on information and belief, then copied the TAMS2 digital environments, interfaces, and hosting resources, to continue providing services to CALTRANS without ICDS's involvement.

84.     DEFENDANTS' transfer also included the Unrelated Environments and materials that ICDS created and hosted for other clients, and DEFENDANTS' conduct interfered with those other relationships.

85.     DEFENDANTS' conduct directly and proximately harmed ICDS, and ICDS seeks to recover from the damages it suffered, which include compensatory damages, consequential damages, and punitive damages.


SECOND CAUSE OF ACTION

(Conversion)

86.     ICDS hereby realleges each allegation in paragraphs 1 through 85 as if fully set forth herein.

87.     Starting August 9, 2022 when the MCSSA was signed, ICDS hosted and controlled the TAMS2 digital environments, interfaces, and hosting resources on behalf of CALTRANS. ICDS was tasked with making the TAMS2 digital environments, interfaces, and hosting resources available for development and use by relevant stakeholders at CALTRANS and expected to work with DEFENDANTS collaboratively to do so.

88.     In early June 2024, DEFENDANTS intentionally, and, with a reckless indifference to ICDS's rights, misappropriated and converted the developed digital environments, interfaces, and hosting resources and, on information and belief, copied that data in order to build their own versions to service CALTRANS without ICDS's involvement.

89.     In addition to the developed digital environments, interfaces, and hosting resources ICDS hosted for CALTRANS pursuant to the MCSSA, ICDS also hosted and developed the Unrelated Environments for other agencies.

90.     When DEFENDANTS misappropriated and converted the TAMS2 digital environments, interfaces, and hosting resources, DEFENDANTS also misappropriated and converted the Unrelated Environments and materials belonging to ICDS.

91.     ICDS did not authorize, or in any way permit DEFENDANTS' conduct and instead was ignorant that it was occurring.

92.     ICDS only learned of DEFENDANTS' conduct when ICDS could no longer access the developed digital environments, interfaces, and hosting resources it had been tasked to host by RIZING and RIZING's contract with CALTRANS.

93.     DEFENDANTS' conduct directly and proximately harmed ICDS, and ICDS seeks to recover from the damages it suffered, which include compensatory damages, consequential damages, and punitive damages.

THIRD CAUSE OF ACTION

(Statutory Theft, Conn. Gen. Stat. § 52-564 against Defendants)

94.     ICDS hereby realleges each allegation in paragraphs 1 through 93 as if fully set forth herein.

95.    Pursuant to the MCSSA, ICDS was entrusted with hosting and maintaining digital environments and data for CALTRANS on the Microsoft Azure cloud storage platform.

96.    DEFENDANTS intentionally and wrongfully took the hosted and maintained CALTRANS digital environments and data by removing ICDS's access to the hosted and maintained TAMS2 digital environments and the Unrelated Environments and retaining access to them for themselves.

97.    While DEFENDANTS maintained control of the hosted and maintained CALTRANS digital environments, on information and belief, DEFENDANTS recreated them before RIZING terminated the MCSSA, forever severing ICDS's access.

98.    DEFENDANTS' conduct directly and proximately harmed ICDS, and ICDS seeks to recover from the damages it suffered, which are to be trebled pursuant to statute.

FOURTH CAUSE OF ACTION

(Tortious Interference with Prospective Business Advantage against Defendants)

99.    ICDS hereby realleges each allegation in paragraphs 1 through 98 as if fully set forth herein.

100.    ICDS was a well-known subcontractor on CALTRANS projects, and had been involved in numerous bids for California, Federal, and other state programs for its information technology services. ICDS had a relationship with DEFENDANTS developed over the course of several CALTRANS projects including TSNR, TAMS1, and TAMS2, and made its other non-CALTRANS projects known to HUSKY and ERICKSON.

101.    In fact, CALTRANS had accepted numerous bids presented by groups including ICDS as a contractor. As such, and because ICDS and DEFENDANTS had effectively serviced

CALTRANS, ICDS had a reasonable expectation of future business relationships with CALTRANS, whether with RIZING or as a subcontractor to another company.

102.    ICDS reasonably expected, because of the success of its work operating the CALTRANS digital environments, interfaces, and hosting resources as part of TAMS2 that it would be a part of future bids to CALTRANS, including and especially TAMS3, for which conversations about ICDS's involvement in RIZING's bid had begun before RIZING's June 10, 2024 termination of the MCSSA.

103.    Additionally, ICDS maintained the Unrelated Environments on behalf of other clients, including government-funded entities with whom ICDS was developing educational materials.

104.    ICDS reasonably expected to profit from its work on this program by selling it to other correctional facilities and governmental agencies as a solution to their need to provide educational materials to inmates and detainees.

105.    DEFENDANTS intentionally and maliciously interfered with ICDS's reasonable expectation of future business with CALTRANS and with ICDS' other government-funded agency clients by, without authorization from ICDS or justification, transferring to themselves or otherwise removing ICDS's access to the CALTRANS digital environments, interfaces, and hosting resources along with the Unrelated Environments.

106.    On information and belief, DEFENDANTS did this transfer and/or removal of access in order to copy the CALTRANS digital environments, interfaces, and hosting resources as a means to be able to pretextually terminate ICDS from the MCSSA and keep the revenue ICDS was to earn from TAMS2 and future contracts.

107.    Additionally, DEFENDANTS' intentional actions wrongfully interfered with ICDS's reasonable expectation of future business by inhibiting ICDS's ability to continue digitally administering

its programs with other government-funded agencies, thereby preventing it from developing its offerings into solutions which could be sold to other correctional facilities and government agencies.

108.    DEFENDANTS' conduct directly and proximately harmed ICDS, and ICDS seeks to recover from the damages it suffered, which include compensatory damages, consequential damages, and punitive damages.

FIFTH CAUSE OF ACTION

(Breach of Contract Against RIZING)

109.    ICDS hereby realleges each allegation in paragraphs 1 through 108 as if fully set forth herein.

110.    On August 9, 2022, ICDS entered into the MCSSA with RIZING to provide informational technology services in support of the California Department of Transportation.

111.    The MCSSA provides in paragraph 1 that "[RIZING] will engage [ICDS] to provide the services for Customer ("Serv ices") as set forth in a Statement of Work that references this Agreement ("SOW") and such SOW will be generally in accordance with Exhibit A, the Statement of Work which is incorporated herein and made a part hereof." The MCSSA goes on in Paragraph 3 to state that "[ICDS] shall supervise, perform, or cause to be performed all Services to be accomplished by [ICDS] Personnel and as further described in the SOW."

112.    Between August 9, 2022, and June 10, 2024, ICDS performed all its obligations pursuant to the terms of the MCSSA including, but not limited to, the building, configuration, and implementation of numerous digital environments, their interfaces, and hosting resources such that RIZING and others could access those environments.

113.    Between August 9, 2022, and June 10, 2024, Rizing paid ICDS a total of $1,776,790 for work ICDS has done under the MCSSA. Rizing has used and accessed ICDS's

digital environments, their interfaces, and hosting resources throughout the same period pursuant to the MCSSA.

114.    On June 10, 2024, RIZING sent notice to ICDS, terminating the MCSSA effective June 24, 2024.

115.    However, RIZING's June 10, 2024, termination was pretextual because it took place solely to cover up DEFENDANTS' wrongful conversion of the CALTRANS hosted environments, and RIZING's breach of the MCSSA and its interference with ICDS' performance of its duties under the terms of the MCSSA.

116.    DEFENDANTS conspired to misappropriate ICDS's developed digital environments, its interfaces, and its hosting resources to provide services which ICDS was contractually responsible for to service RIZING's clients and keep the revenue that ICDS would otherwise have earned in the MCSSA and in subsequent agreements.

117.    At the time RIZING purported to terminate the MCSSA, ICDS expected to earn $1,261,765 in additional revenue through the duration of the MCSSA.

118.    RIZING breached its obligations under the MCSSA by usurping and attempting to perform ICDS's duties which were expressly enumerated. After its breach of the MCSAA began, RIZING wrongfully terminated the MCSSA to cover up its malfeasance and interference with ICDS's performance of its duties under the terms of the MCSSA.

119.    As a direct and proximate result of RIZING's breach of the MCSSA, Plaintiff was injured in an amount not less than $1,261,765.

SIXTH CAUSE OF ACTION

(Breach of the Implied Covenant of Good Faith and Fair Dealing Against RIZING)

120.    ICDS hereby realleges each allegation in paragraphs 1 through 119 as if fully set forth herein.

121.    Upon information and belief, DEFENDANTS conspired to misappropriate ICDS's developed digital environments, its interfaces, and its hosting resources to provide services which ICDS was contractually responsible for to service CALTRANS without ICDS's involvement and keep the revenue that ICDS would otherwise have earned in the MCSSA and in subsequent agreements.

122.    On information and belief, DEFENDANTS used their existing access rights and privileges to transfer to their exclusive control ICDS's developed digital environments, its interfaces, and its hosting resources and away from ICDS. RIZING did not pay to own or control ICDS's developed digital environments, its interfaces, and its hosting resources, nor did ICDS consent to such a transfer.

123.    RIZING's actions prevented ICDS from performing its numerous obligations spelled out in the MCSSA, breaching the implied covenant of good faith and fair dealing. After its misconduct, RIZING quickly terminated the MCSSA to cover up its misdeeds, cutting ICDS off from not less than $1,261,765 in revenue ICDS would have attained but for RIZING's conduct.


SEVENTH CAUSE OF ACTION

(Violation of the Conn. Unfair Trade Practices Act against Defendants)

124.    ICDS hereby realleges each allegation in paragraphs 1 through 123 as if fully set forth herein.

125.    DEFENDANTS have acted, as alleged herein, in the conduct of trade or commerce as defined in Conn. Gen. Stat. §42-110a(4).

126.    DEFENDANTS' conduct as described herein is part of a general business practice constituting a violation of the Conn. Unfair Trade Practices Act, Conn. Gen. Stat. §42-110b(a), and gives rise to a cause of action under Conn. Gen. Stat. §42-110g(a).

127.    As a direct and proximate result of DEFENDANTS' violation of the Conn. Unfair Trade Practices Act, Conn. Gen. Stat. §42-110b(a), ICDS has suffered ascertainable losses under Conn. Gen. Stat. §42-110g(a), in an amount to be proven at trial.

128.    As a result of DEFENDANTS' unfair and/or deceptive trade practice, they have reaped ill-gotten profits and gains, which they otherwise would not have received and which in equity, they should be required to discharge.

129.    DEFENDANTS are liable, pursuant to Conn. Gen. Stat. §42-110g(a), for punitive damages.

130.    Furthermore, DEFENDANTS are liable, pursuant to Conn. Gen. Stat. §42-110g(d), for reasonable attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant the following relief:

1.    As for the First Cause of Action, an amount to be proven at trial;

2.    As for the Second Cause of Action, an amount to be proven at trial;

3.    As for the Third Cause of Action, treble damages on an amount to be proven at trial;

4.    As for the Fourth Cause of Action, an amount to be proven at trial;

5.    As for the Fifth Cause of Action, an amount no less than $1,261,765 plus interest,

reasonable attorney's fees, and court costs;

6.      As for the Sixth Cause of Action, an amount no less than $1,261,765 plus interest, reasonable attorney's fees, and court costs;

7.      As for the Seventh Cause of Action, an amount to be proven at trial, reasonable attorney's fees, punitive damages, and court costs; and

8.      Such other relief as this Court deems just and proper.


Dated: Greenwich, Connecticut                IVEY, BARNUM & O'MARA, LLC
       December 18, 2025

                                             By:     /s/ Andrea C. Sisca
                                                  Andrea C. Sisca, Esq. (CT29281)
                                                  170 Mason Street
                                                  Greenwich, Connecticut 06830
                                                  Telephone: (203) 661-6000
                                                  Email: asisca@ibolaw.com


                                             GILBERT LAW PLLC

                                             Jake M. Gilbert (*pro hac vice*
                                             *forthcoming*)
                                             99 Wall Street, #1748
                                             New York, NY 10005
                                             Telephone: (646) 580-6733
                                             Email: jake@gilbertlaw.co